UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS JUAREZ CORTEZ, | No. C 04-674 SI (pr) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| D.L. RUNNELS, Warden, | |
| Respondent. | |

**INTRODUCTION**

Carlos Juarez Cortez, a California prisoner incarcerated at High Desert State Prison, filed this pro se action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

**BACKGROUND**

A.   The Crime

Cortez and his girlfriend Carmen Bautista had a tumultuous relationship. Cortez for years had accused Bautista of seeing other men and they had many arguments based on his jealousy. Cortez and Bautista argued the week of her killing regarding Cortez's jealousy and Bautista's decision to move out. Two days before the killing, Bautista packed some bags, and was planning to move out the next week. Cortez approached Bautista as she was waiting for a ride to work on the morning of the killing. Cortez told police he wanted to see if the man he believed she was meeting was there. When Cortez did not see the man, he asked Bautista why she was moving out.

Cortez told police that, during the course of their discussion, Bautista slapped him, shook him, and threatened to throw his things onto the street. Cortez then stabbed Bautista thirteen times and fled the scene.

The California Court of Appeal described in greater detail the evidence of the crime leading to Cortez's murder conviction:

> On August 31, 2000, between 3:40 and 4:00 a.m., defendant stabbed to death his 32-year-old live-in girlfriend Carmen Bautista while she was waiting outside their apartment to be picked up to go to work. At trial, the defense claimed the incident was a sudden quarrel out of heat of passion because defendant believed Bautista was having an affair with another man. Defendant, 30 years older than Bautista, started a relationship with her years earlier in Mexico which resulted in the birth of their son, at the time of trial, 14 years old. Defendant had a wife living in another town in Mexico. Defendant spent a lot of time with Bautista, her daughter Alma, and his son, although he did not live with them. Alma testified that she recalled defendant being drunk most of the time and frequently accusing her mother of seeing other men. Alma stated Bautista moved to Chicago in 1999 to get away from defendant.
>
> In July 2000, Bautista and defendant reunited and rented a room in the Gilroy apartment of Victoria Robles and her boyfriend Gilberto Hernandez. By the end of July, Robles noticed that defendant was jealous and that he and Bautista would argue a lot about his jealousy. She also testified that defendant always drank and smelled of alcohol.
> According to Robles, Bautista left the house around 3:30 a.m. to be picked up to go to work. Sometimes defendant accompanied her outside. Bautista's "ride," Pedro Huerta, would blow the horn. She would go out and defendant would follow her. Huerta and Bautista worked in different departments at a sheet metal company. Huerta testified that he regularly picked up four other employees and brought them to work in the mornings. When Bautista, who had been on the 6:00 a.m. shift started the 4:00 a.m. shift, he agreed to pick her up too. Huerta stated he and Bautista were not romantically involved.
>
> Towards the end of July, Robles heard defendant start to accuse Bautista of going out with the guy who gave her a ride and that the guy who gave her a ride was her lover. Robles stated Bautista "wouldn't let him get away with it, and she would defend herself from the things that he would tell her."
>
> On the Saturday before Bautista died, defendant claimed that he saw a man meet her while she was waiting for work. Bautista reached up and kissed him. That evening, defendant and Bautista and Robles and Hernandez went to a bar. Bautista refused defendant's invitation to dance, but danced with another man. Defendant thought he might be the man who met Bautista in the morning. Robles and Bautista and the man were dancing "not close together, separately, and [defendant] came and dumped a beer on her head." Defendant grabbed her arm and pulled her towards the table to sit down. Bautista was angry. Robles had also seen defendant push Bautista, who was four feet ten inches tall and 110 pounds, once before.
>
> The next morning, Bautista's friend Tere arrived to take her to Mass. Defendant tried to stop them by lying against the hood of Tere's car with his arms outstretched. When he refused to move, Tere called the police, but defendant still would not move. Bautista and Tere left defendant on the car and walked to church. Defendant got into the car and lay down on the back seat. After a short while, he got out and went into his room. Fifteen

minutes later, Robles could hear something being sharpened. Looking through the keyhole, she saw defendant "sharpening something like a knife." She could not see exactly what it was, but defendant had a knife with a blade that pulled out that he used to cut lemons, onions, or peppers.

On Monday morning, defendant went outside before Bautista left for work to look for the man. Defendant told police that when he opened the door, he saw the man facing him, but when the man saw defendant come out, he lay down on top of the cab of a neighbor's truck that was parked there. Defendant went back inside and told Bautista, "there's the man again the one that always is there when you go out, but I didn't tell her anything else, like why do you kiss him or why, no . . . can I accompany you, I said to her. I wouldn't want him to grab you or to be tempted, no. [¶] No, she said, don't worry about me, she said, well, I stayed, but looking through the window towards where she went, they were in the dark away from the light of the apartment door, he was there in the dark, and when he heard again the door opening then he noticed her, . . . . [S]he would talk to him and he would talk to her, and what he did is, she would reach to him and always, she would reach him and kiss him, or they kissed, I should say, but she didn't hug him and he didn't hug her, they just kissed, and the man after he did that, he would go in the dark there [¶] . . . [¶] near that house, he goes there and he gets lost there, I never followed him, I never talked to him, I never did anything[.] [T]hat happened on Monday, Tuesday, he didn't go, Wednesday, which was yesterday, he went, to my surprise, . . . the man was not there[1] . . . I turned around and I went inside, or he was in the dark, who knows . . . ."

Monday evening Bautista told Robles she was moving out of the apartment on August 31 the coming Thursday. Monday night, Robles, Bautista, and defendant were talking about Bautista's leaving and defendant said that she would not leave through the front door. He said that he was not going to leave and that he would not let her leave either. Robles said she told defendant "if she leaves you get out." Defendant was angry. "[H]e was even willing to give me four months in advance but . . . he would not leave."

Tuesday, Bautista packed her bags. Robles stated defendant could see her packing them and she would tell him "'I'm leaving' And he didn't believe it." That night, Bautista, Robles, and defendant talked about Bautista's leaving and defendant, upset, said in a loud voice that she was not leaving. Robles told defendant not to yell at her and that when Bautista left, he would have to go too. On Wednesday morning, Bautista and the man hugged and kissed again.

On the morning of Thursday, August 31, defendant went to see if the man was there but he was not. Defendant and Bautista argued outside in the parking lot. Defendant insisted Bautista tell him a "motive" for leaving ("there was to be a motive"). Defendant tried to hug and kiss her because "I would always hug her, I would kiss her, when she would go or I would go to work…." This time Bautista slapped defendant's cheek and grabbed at his shirt and shook him. She told him she would throw his things onto the street if he was not gone by the time she came home. At this point, defendant "felt bad, because she

---

[1] "Later in his statement, defendant said the man was there on Wednesday, and 'as she was approaching him, he stretched forward his hands and hugged her and she did the same, she didn't..[sic] he didn't hug her from the neck, . . . . no, but he grabbed her from below the waist and he put her against him and she also put her hands around his shoulders and they were there for about . . . some time, possibly for about half…half a minute kissing. [¶] Well, that's when I got mad, no, and I said to her, look, you know what, come here and let's talk, but since her ride arrived at that time, she ran and left, she got in, and I couldn't . . . he stayed on the other side of the [¶] . . . [¶] [H]e turned like this and he went back to the dark area next to the house.'"

3

> didn't tell me with good words, but mistreating me, and that's the reason I lost my head." Defendant told the detectives, "she humiliated me more than enough and she . . . she humiliated me and she abused me, and she told me that I was going to find my things thrown there." "[S]he would abuse me, she was always kicking me out, get out of here, very humiliating things, but I was putting up with all that, I was putting up . . .[¶] but she didn't see the pain, I know because she grabbed me from the skin, the chest, the neck, and she shook me and she wanted to hit me, slap me then, no? [¶] ... [¶] I lost the head, I lost the head." Defendant pulled an opened knife out of his pocket and stabbed her.

Cal. Ct. App. Opinion, pp. 1-5.

Bautista died within minutes of the stabbing. Cortez was arrested later that morning. Cortez did not testify at trial. In closing argument, defense counsel argued that Cortez "lost his senses and did kill her in a heat of passion. . . ." Cal. Ct. App. Opinion, p. 5.

The knife used by Cortez was a buck knife with a 4-inch folding blade. Cortez stabbed Bautista a total of thirteen times (including the defensive wounds to her hands), only one of which was a fatal wound. Robles testified that other than the incident four days prior to the killing, she had never heard Cortez sharpen his knife.

B.  Case History

Following a jury trial in Santa Clara County Superior Court, Cortez was convicted of first degree murder. Cortez was sentenced to 25 years to life for the murder plus one year for an arming enhancement.

Cortez unsuccessfully appealed. The California Court of Appeal affirmed the judgment of conviction and denied Cortez's petition for writ of habeas corpus. The California Supreme Court denied the petition for review.

Cortez's federal habeas petition raised two claims: First, Cortez claimed that the trial court's failure to issue adequate clarifying jury instructions on premeditation and deliberation violated his right to due process under the Fourteenth Amendment to the U.S. Constitution. Second, he claimed that his counsel provided ineffective assistance in violation of his Sixth Amendment right to counsel by failing to object to the trial court's failure to issue adequate clarifying jury instructions. The court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer and petitioner filed a traverse. The matter is now ready

4

for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially

indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

A.    Jury Instructions

Cortez contends that the trial court erred in failing to properly clarify jury instructions regarding premeditation and deliberation following two jury questions. The jury submitted two questions, both of which were answered by the court following consultation with the attorneys. Cortez claims these two questions indicated a "fundamental misunderstanding of the meaning of premeditation and deliberation. The jurors were obviously struggling over what, if any, distinction existed between intent to kill and premeditation and deliberation, and were ignoring the requirement of premeditation." Petitioner's Memorandum of Points and Authorities, filed Feb. 18, 2004, p. 1. The court's responses to the inquiries allegedly violated Cortez's right to due process under the Fourteenth Amendment to the United States Constitution.[2]

To obtain federal habeas relief for errors in the jury charge, the petitioner must show that

---

[2] Respondent contends that this claim is procedurally barred based on defense counsel's approval of the court's responses to the jury's inquiries. The record is not adequate for this court to honor the procedural bar. The trial court responded, and memorialized its response, to the second jury question outside counsel's presence, so it cannot be said with certainty that counsel had the opportunity to object if the agreed-upon response was not that which was actually given. Moreover, the state court of appeal's decision is ambiguous as to whether the bar was imposed or the bar side-stepped because the ineffectiveness claim required that the merits of the instructional error claim be considered. See Cal. Ct. App. Opinion, pp. 6-7.

6

"the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991)(internal quotes omitted). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. at 72. In reviewing an ambiguous instruction, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. See id. at 72 & n.4.

"When a jury makes explicit its difficulties, a trial judge should clear them away with concrete accuracy." Bollenbach v. United States, 326 U.S. 607, 612-13 (1946). The trial judge has a duty to respond to the jury's request for clarification with sufficient specificity to eliminate the jury's confusion. See Beardslee v. Woodford, 358 F.3d 560, 574-75 (9th Cir. 2004) (harmless due process violation occurred when, in responding to request for clarification, court refused to give clarification and informed jury that no clarifying instructions would be given); United States v. Frega, 179 F.3d 793, 808-11. (9th Cir. 1999) (trial judge's confusing response to jury's questions raised possibility that verdict was based on conduct legally inadequate to support conviction). However, the trial judge has wide discretion in charging the jury, a discretion which carries over to the judge's response to a question from the jury. Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003). Under California law, when the original instructions are full and complete, the trial court has discretion to determine what additional explanations are sufficient to satisfy the jury's request for information. (Cal. Ct. App. Opinion, p. 7) "'Indeed, comments diverging from the standard are often risky.'[Citation]" (Cal. Ct. App. Opinion, p. 11). Where the original instruction was correct and the judge directed the jury to a precise paragraph that answered the question clearly, this was sufficient to pass constitutional muster. Weeks v. Angelone, 528 U.S. 225, 234 (2000). Also, just as a jury is presumed to follow its instructions, it is presumed to understand a judge's answer to a question. Id. at 234.

1. First Jury Question

In the first question, the jury asked the court, "Can you clarify the difference 'having in

7

1  mind the consequences, he decides to and does kill' and insufficient to prove deliberation and

2  premeditation?" CT 1. Following a request by the judge to clarify the question, the jury added

3  "CALJIC No. 8.20 vs. CALJIC No. 8.30." RT 898. The court responded:

> CALJIC 8.20, which is your instruction number 33, contains definitions of deliberate and premeditated murder and some guidance on how that is defined. [¶] CALJIC 8.30 is directive in nature, and it's intended to tell you that if you have an issue between first and second degree murder, then you should give the defendant the benefit of the doubt and convict him of second degree murder. If you unanimously find the elements of second degree murder, as has been defined for you elsewhere in the instructions. [¶] So that is, I think, the answer to the question. I'm getting some vague looks from the jury.

RT 899.

The original jury instructions CALJIC 8.20[3] and CALJIC 8.30[4] are accurate statements of the law. The trial court appropriately pointed the jury to CALJIC 8.20 noting that it contained a definition of and guidance regarding premeditation and deliberation. The explanation of CALJIC 8.30 was also accurate and appropriate.

The clarification was not confusing, and a reasonable jury would understand the distinction between premeditation and deliberation, as well as the function of CALJIC 8.20 and CALJIC 8.30. The "vague looks from the jury" do not necessarily indicate that the jurors were not able to

---

[3] CALJIC 8.20 as given to the jury provided: "All murder which is perpetrated by any kind of willfull, deliberate and premeditated killing with express malice aforethought is murder of the first degree. [¶] The word 'willfull,' as used in this instruction, means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree. [¶] The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. [¶] The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] decides to and does kill." Cal. Ct. App. Opinion pp. 7-8 (errors in original).

[4] CALJIC 8.30 as given to the jury provided: "Murder of the second degree is the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation. Cal. Ct. App. Opinion p. 8

United States District Court
For the Northern District of California

understand the clarification. And the comment by the trial court judge "[s]o that is, I think, the answer to the question" in no way suggests that the jury was precluded from asking further questions. Cf. Beardslee, 358 F.3d at 575 (asserting a jury was precluded from asking further questions by the admonition that there "is and can be no explanation of the instructions" and the command to "do the best that you can"). Had the court's explanation not been helpful to the jury, the jurors could have requested further clarification.

Following the submission of this first question the jury deliberated for approximately fifteen minutes further before ending deliberations for that day. At the end of the day, one juror was excused.[5]

2. Second Jury Question

The next morning, an alternate juror was called to take the place of the dismissed juror. The reconstituted jury was instructed to disregard earlier deliberations and begin anew so that each juror would have equal participation. The jury deliberated for approximately an hour and fifteen minutes before sending a note stating: "I need help defining rash impulse. Would rash impulse be? -- example: Carlos stabbing Carmen once and thought what did I do and continued stabbing her to leave her dead? Would that be rash impulse to prove deliberation? If his only thought was -- I started stabbing her I better kill her -- is that calculated judgment or rash impulse?" CT 2 (errors in original). The judge's actual response was not transcribed, but after he responded he described for the record what had occurred:

> I called the attorneys in and met with the attorneys, and we agreed upon the following answer, in three parts: One, the phrase "rash impulse" does not have a special or technical meaning or definition. It means what your collective common sense thinks it means. [¶] Two, I am concerned about the portion of your question that reads: 'Would that be rash impulse to prove deliberation.' As we have defined deliberate for you in your instruction [n]umber 33, which is CALJICS 8.20, it is not synonymous with rash impulse. Indeed, the

---

[5] The Court of Appeal felt the first jury question was irrelevant because one juror was removed and an alternate was substituted in, thus creating a "new" jury and an instruction by the trial court to start deliberations anew. This court disagrees. Had there been a misstatement of the law in response to the first question, it could have impacted the reconstituted jury's deliberations; this court does not see the first exchange as wholly irrelevant. This point need not be further explored because there was no error in the response to the first question.

9

word deliberation and rash impulse have substantially different meanings. [¶] Three, I cannot tell you 'if his only thought was 'well, I started stabbing her so I better kill her,' is that calculated judgement or rash impulse' That question is entirely for you to decide. Based on our previous stipulations and the continued agreement of the attorneys, I entered the jury room and read them that response. There was no other communication between the Court and the jury, and I just wanted to memorialize what we just did. The jury continues to deliberate.

RT 903-04.

Cortez contends that the trial court should have clearly defined the difference between rash impulse and deliberation, rather than directing the jury to the definitions contained in CALJIC 8.20. Cortez also interprets the jury question to mean that the jury equated rash impulse with deliberation and that the jury had forgotten about the requirement of premeditation. He also contends the hypothetical question in the note evidenced at least one juror's belief that the stabbing was not premeditated or deliberate. Cortez's arguments are not persuasive.

The court's statements were legally correct clarifications to the legally correct original instructions. Even if the jury had mistakenly equated rash impulse and deliberation, any confusion was resolved when the court clarified the law by clearly stating that rash impulse was not the same as deliberation. The court adequately told the jury to use its "collective common sense" to determine the meaning of "rash impulse." The court also adequately addressed the meaning of "deliberation" by referring the jury to CALJIC 8.20, which included a clear definition of "deliberate." Furthermore, the court appropriately refused to answer the hypothetical question posed by the jury note. See Arizona v. Johnson, 351 F.3d at 994 (collecting cases noting danger of court invading jury's fact-finding province when it answers hypothetical questions, especially with yes/no answers). Had the court answered the hypothetical question with a yes or no answer, it could have led some jurors astray by unduly suggesting that was the factual scenario the trial judge personally thought had occurred. See id. Also, had the trial judge answered the hypothetical question, Cortez probably would be challenging the propriety of him doing so regardless of whether he answered yes or no.

The absence of the word premeditation in the jury question did not suggest that the jury forgot that premeditation was a requirement of murder in the first degree. Rather, the absence of

10

the word more likely indicated that the jury needed no further clarification on the subject of premeditation. The premeditation requirement for first degree murder was reinforced by the direction that the jury review CALJIC 8.20, which included a definition of premeditation and clearly indicated that it was required.

For Cortez's second argument, that the hypothetical question in the note evidenced at least one juror's belief that the stabbing was not premeditated or deliberate, he notes that only one wound was fatal, and it is unknown when in the sequence of the stabbing the fatal stabbing occurred. Even if the hypothetical reflected confusion by a juror, the court's response, followed by further (albeit quick) deliberation, allowed time for resolution of the confusion after the court directed the jury to CALJIC 8.20 which, when followed, would not allow a conviction if the requisite mental state did <u>not</u> arise until after the fatal wound.

The state court's determination that there was no instructional error was not contrary to or an unreasonable application of clearly established federal law. The jury was correctly instructed under California law about the requirements of premeditation and deliberation to commit murder in the first degree.[6] The court used the California pattern instructions CALJIC 8.20 on deliberate and premeditated murder and CALJIC 8.30 on unpremeditated murder of the second degree. The court's statements to the jury were legally correct clarifications to the legally correct original instructions. There is no reasonable likelihood that the jury applied the instructions and the court's response to its notes in a way that violated the Constitution. The trial court's statements were not confusing. A reasonable jury would understand the necessity for premeditation and deliberation on the basis of the instructions for a first degree murder conviction. Cortez's various

---

[6] The original jury charge included several other instructions pertaining to the killing. The jury was instructed with CALJIC 8.00, homicide defined; 8.10, murder defined; 8.11, malice aforethought defined; 8.20, deliberate and premeditated murder; 8.30, unpremeditated murder of the second degree; 8.31, second degree murder--killing resulting from unlawful act dangerous to life; 8.40, voluntary manslaughter defined; 8.42, sudden quarrel or heat of passion and provocation explained; 8.43, murder or manslaughter--cooling period; 8.44, no specific emotion alone constitutes heat of passion; 8.50, murder and manslaughter distinguished; 8.55, homicide--cause defined; 8.70, duty of jury as to degree of murder; 8.71, doubt whether first or second degree murder; 8.72, doubt whether murder or manslaughter; 8.74, unanimous agreement as to offense--first or second degree murder or manslaughter; and 8.75, jury may return partial verdict, homicide. Cal. Ct. App. Opinion pp. 7-8.

11

arguments about what the court could have said in response to the jury questions do not show that what the court actually did do was constitutionally deficient. Because there was no error, the court does not consider whether the error was harmless.

### B. Ineffective Assistance of Counsel Claim

Cortez contends that his counsel's acquiescence in the court's responses to the jury questions deprived him of effective assistance of counsel. As noted earlier, before the court responded to both questions the court consulted with counsel. Neither the prosecution nor defense counsel objected to the court's responses to the questions. The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective assistance, of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984). The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, id. at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. See id. at 691-94.

Cortez's claim fails for a lack of showing of deficient performance and lack of showing of prejudice. As explained earlier, there is no merit to Cortez's claim of instructional error. Counsel thus did not engage in deficient performance and no prejudice resulted from counsel's failure to make a futile objection to the court's responses to the jury question. See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996), cert. denied, 519 U.S. 1142 (1997)(failure to take futile action can never be deficient performance). The trial court's clarification following the jury's questions was correct; there was no error as to which counsel should have objected. The California Court of Appeal's rejection of the ineffective assistance claim was not contrary to or an unreasonable

12

application of clearly established federal law.  Cortez is not entitled to the writ on this claim.

**CONCLUSION**

The petition for writ of habeas corpus is DENIED.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: June__20_, 2005              S/Susan Illston
                                    SUSAN ILLSTON
                                    United States District Judge

13